**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JACKIE EUGENE SMITH, JR.,**

      **Plaintiff,**

**vs.**                                                  **CIVIL ACTION NO. 3:16-CV-09149**

**NANCY A. BERRYHILL,[1]
ACTING COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered September 28, 2016 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 24 and 27.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

judgment on the pleadings (Document No. 24.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 27.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

## Procedural History

The Plaintiff, Jackie Eugene Smith, Jr. (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on September 10, 2013, alleging disability since July 8, 2013, because of "copd, left shoulder, asthma, bronchitis, emph[y]sema, rotat[o]r cuff left shoulder, both knees hurt, and blood pressure".[2] (Tr. at 259.) His claims were initially denied on February 24, 2014 (Tr. at 134-139.) and again upon reconsideration on August 11, 2014. (Tr. at 146-148, 149-151.) Thereafter, Claimant filed a written request for hearing on September 5, 2014. (Tr. at 154-155, 156-158.) An administrative hearing was held on April 29, 2015 before the Honorable Paul Gaughen, Administrative Law Judge ("ALJ"). (Tr. at 29-77.) On May 29, 2015, the ALJ entered a decision finding Claimant had not been under a disability at any time from July 8, 2013 through the date of the decision. (Tr. at 10-28.) On August 3, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 5.) The ALJ's decision became the final decision of the Commissioner on July 23, 2016 when the Appeals Council denied Claimant's Request.[3] (Tr. at 1-4.)

On September 27, 2016, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) The Commissioner

---

[2] In his Disability Report – Appeal, submitted on May 20, 2014, Claimant alleged "seems if I try to do things I cannot finish, get tired and out of breath." (Tr. at 300.) In a subsequent Disability Report, submitted on September 5, 2014, he asserted, "My breathing is worsening, I get out of breath just going to the restroom, walking, can't hardly sleep laying down" and "I am unable to complete any tasks that take prolonged standing. I am unable to walk very far." (Tr. at 319.)

[3] Claimant advised that he subsequently filed another application for disability and is currently receiving Title II benefits. (Document No. 24 at 1, fn1.)

filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 21 and 22.) Subsequently, Claimant filed a Brief in Support of Motion for Judgment on the Pleadings (Document No. 24.); in response, the Commissioner filed a Brief in Support of Defendant's Decision. (Document No. 27.) Consequently, this matter is fully briefed and ready for resolution.

## Claimant's Background

Claimant was 52 years old as of the alleged onset date, and considered a "person closely approaching advanced age" as of the date of the ALJ's decision and throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(d), 416.963(d). (Tr. at 21, 33.) Claimant has a high school education. (Tr. at 260.) Claimant quit working on July 8, 2013 when he was employed at Felman Production, a steel/alloy plant, due to pain in his knees and left shoulder, as well as his breathing problems caused by metal dust and fumes. (Tr. at 55.)

## Standard

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third

inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2018. (Tr. at 15, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of July 8, 2013. (Id., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant had the following severe impairments: severe musculoskeletal impairment of the left upper extremity status post multiple surgeries; bilateral knee osteoarthritis status post-surgical procedures; chronic obstructive pulmonary disease (COPD); and right-side hearing loss. (Tr. at 16, Finding No. 3.) At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20

4

C.F.R. Part 404, Subpart P, Appendix 1. (Id., Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work:

> except the claimant can occasionally use the left non-dominant upper extremity for overhead reaching or reaching with the arm fully-extended away from the body, but can frequently use the left arm within about 16 inches of the body and not overhead; is limited to lifting 10 pounds maximum with the left arm alone; can occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds with the right arm alone or with some assistance from the left arm; needs regular work hours with customary breaks and no unusual work stressors; can work on the feet standing or walking short distances for two hours at once and for six hours total in an eight-hour workday; can occasionally forward bend or stoop; can less than occasionally, but for up to ten percent of the workday, squat, crawl, kneel, or crouch; cannot keep up with fast-paced production demands; should not work in a dangerous industrial setting, doing ladder work, at unprotected heights, around toxic levels of fumes, gasses, or odors, or around excessive noise from industry.

(Tr. at 17, Finding No. 5.)

At step four, the ALJ found Claimant was unable to perform any past relevant work. (Tr. at 21, Finding No. 6.) At the final step, the ALJ found that in addition to the immateriality of the transferability of job skills, Claimant's age, education, work experience, and RFC indicated that there were jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 21-22, Finding Nos. 7-10.) Finally, the ALJ determined Claimant had not been under a disability from July 8, 2013 through the date of the decision. (Tr. at 23, Finding No. 11.)

### Claimant's Challenges to the Commissioner's Decision

Claimant asserts several errors in support of his appeal. For starters, he appears to argue that the ALJ impermissibly determined his RFC assessment prior to assessing Claimant's credibility in contravention to Mascio v. Colvin, 780 F.3d 632 (4th Cir. 2015). (Document No. 24 at 5-6.) However, Claimant further contends that the ALJ failed to explain how he arrived at his conclusions without organizing the medical and other evidence, specifically with regard to Exhibit

5F, to which the ALJ did not assign any weight.[4] (Id. at 6; Tr. at 852-887.) Claimant also argues that the opinion provided by his treating physician, Dr. Wesley Lieving, was given little weight by the ALJ ostensibly because he found Claimant's symptoms were less severe than they were when he was working that runs afoul of Social Security Ruling 16-3p. (Id. at 7.) Claimant contends that the RFC did not fairly set out all of his impairments: his hearing loss in his right ear; his restrictions from toxic fumes, gases and odors without defining what "toxic" levels are; his limited range of motion in his left arm; and his use of his nebulizer every six hours. (Id. at 8-9.) Claimant also asserts that the testimony provided by the vocational was confusing, and that he impermissibly modified the exertional requirements of a job. (Id. at 9.)

Claimant asks that the final decision be vacated, or reversed and remanded to correct these errors. (Id. at 10.)

In response, the Commissioner asserts that the ALJ gave the appropriate weight to Dr. Lieving's checkbox form opinion because it was inconsistent with the evidence and gave a sufficient explanation for the weight given pursuant to the Regulations. (Document No. 27 at 7-9.) Moreover, the ALJ properly rejected Dr. Lieving's opinion that Claimant was only capable of working at the sedentary level because it was inconsistent with the evidence, including Dr. Lieving's own treatment notes, and only the ALJ has the authority to make RFC determinations. (Id. at 9-11.) The Commissioner also argues that the ALJ considered all the opinion evidence, including consultative examiner Dr. Nutter, and incorporated that evidence into the hypothetical questions posed to the vocational expert, who noted which jobs Claimant could still perform. (Id.

---

[4] This Exhibit contains the medical records pertaining to the colonoscopy ordered by Dr. Lieving and Claimant's subsequent return to the hospital about a week later for treatment due to rectal bleeding. This will be addressed further, *infra*.

at 11, fn7.) Further, the Commissioner contends that the ALJ's hypotheticals to the vocational expert only need to include those impairments supported by the record, and his rejection of Dr. Lieving's more extreme limitations was appropriate. (Id. at 11-12.)

The vocational expert's testimony was consistent with the Dictionary of Occupational Titles, and responsive to the ALJ's hypothetical question, which was identical to the RFC. (Id. at 12.) Because the RFC was based on substantial evidence, and the hypothetical question and the vocational expert's responses thereto are also supported by substantial evidence. (Id.) The ALJ's decision was a product of the proper application of the law and supported by substantial evidence, and therefore must be affirmed. (Id. at 13.)

**The Relevant Evidence of Record**[5]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Pre-Alleged Onset Date Treatment:

Claimant received treatment at Pleasant Valley Hospital from 2007 through 2013 for a variety of ailments, primarily for shortness of breath and aggravation of his COPD. With respect to his other physical impairments, medical records indicate that in November 2007, Claimant had a medial meniscectomy of his left knee. (Tr. at 550-551.) Medical records further indicate that Claimant underwent arthroscopic surgery of his right knee prior to having his left knee treatment.[6] (Tr. at 548.) In January 2008, an MRI of Claimant's left shoulder revealed a chronic rotator cuff tear and muscle arthropathy, after having used a broom and shovel at work two weeks previously.

---

[5] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

[6] The Court Transcript does not contain medical records concerning the right knee surgery.

(Tr. at 543, 705.) His initial rotator cuff surgery was in February 2008 (Tr. at 586-587, 590-591, 932-933.) Claimant underwent another repair of the rotator cuff after a re-tear in June 2008. (Tr. at 583-584, 930-931.) By January 2009, Claimant had another surgery on his left shoulder to remove a synovial cyst. (Tr. at 556.)

Consultative Medical Examiners:

In November 2013, James Wagner, D.O., with the West Virginia Department of Health & Human Resources Medical Review Team, conducted a physical examination of Claimant. (Tr. at 840-842.) Dr. Wagner observed Claimant's posture and gait to be normal, although his knees hurt a lot with bending. (Tr. at 840, 841.) Dr. Wagner diagnosed Claimant with COPD, shoulder pain and poor hearing. (Tr. at 841.) Dr. Wagner did not refer Claimant for vocational rehabilitation, and opined that he "probably he can never work." (Id.) Dr. Wagner summarized his conclusions stating that Claimant had COPD for three years with pneumonia and suffers from dyspnea all the time; Claimant underwent three rotator cuff repairs but still has pain which prevents him from lifting; he also had three scopes of his knees and continues to have pain with bending or standing; and he has poor hearing. (Tr. at 842.)

In February 2014, Stephen Nutter, M.D., DDS examiner, performed a consultative examination. (Tr. at 843-846.) Dr. Nutter observed that Claimant ambulated with a normal gait, did not require a handheld assistive device and appeared stable at station and comfortable in the supine and sitting positions. (Tr. at 844.) He had mild difficulty understanding conversational level voice. (Id.) An examination of Claimant's chest revealed that the AP diameter was somewhat increased, with expiratory phase of respiratory was slightly increased compared to inspiratory phase. (Id.) His breath sounds showed diminished air movement and coarse breath sounds with

8

some expiratory wheezes were noted. (Id.) Claimant was not noted to be short of breath with exertion or when lying flat during the exam. (Id.) Chest imaging showed chronic changes, but no lung infiltrates. (Tr. at 847.) A pulmonary function study indicated normal results. (Tr. at 848.)

He had pain and tenderness in his left shoulder; forward flexion of the shoulders was 0 to 165 degrees on the right, and 0 to 90 degrees on the left. (Tr. at 845.) Abduction was 0 to 180 degrees on the right, and 0 to 90 degrees on the left. (Id.) Internal rotation of the shoulder was 0 to 70 on the right, and 0 to 55 degrees on the left; external rotation was 0 to 90 on the right, and 0 to 70 degrees on the left. (Id.) Flexion and extension of both elbows and wrists were identical. (Id.) Dr. Nutter noted Claimant's left arm strength was 4/5 due to pain, but he had 5/5 strength otherwise. (Tr. at 846.)

Claimant was able to stand on one leg at a time with difficulty balancing; he was able to squat but had knee pain. (Id.) on the right and on the left Plaintiff was able to squat, but with knee pain. (Id.)

Dr. Nutter diagnosed Claimant with shortness of breath, COPD, and posttraumatic degenerative arthritis. (Id.)

Dr. Lieving Treatment Records:

In February 2014, Claimant established care with Dr. Lieving for COPD and chronic left shoulder pain. (Tr. at 902-903.) Dr. Lieving encouraged smoking cessation, noting Claimant "absolutely needs to quit." (Tr. at 906.) In April 2014, Claimant returned to Dr. Lieving complaining of left shoulder pain at a level 3 out of 10. (Tr. at 888.) Dr. Lieving placed him on Mobic and tramadol for his left shoulder pain, and continued to encourage Claimant to cease his occasional smoking due to his moderate COPD. (Tr. at 892.) His exam was otherwise normal. (Tr.

at 888-892.)

In May 2014, Claimant underwent a colonoscopy. (Tr. at 854-857.) About a week later, he returned to the hospital for rectal bleeding after the procedure. (Tr. at 858-887.) It was noted that Claimant's COPD was stable with medications. (Tr. at 869.) His physical examination, including upper and lower extremities, was normal, and he reported a pain level of zero. (Tr. at 858.) He had 5/5 strength in all extremities. (Tr. at 859.)

In June 2014, Claimant returned to Dr. Lieving for a hospital follow up visit. (Tr. at 893-897.) His COPD was stable. (Tr. at 894.) He reported left shoulder pain he described as burning, being worse at night and unfazed by Mobic, he stopped taking tramadol. (Id.) Dr. Lieving started him on gabapentin 300 mg at night for his chronic left shoulder pain and instructed to continue his other medications. (Tr. at 897.) In October 2014, Claimant had a six month follow up with Dr. Lieving; he said he could not walk up an incline without severe shortness of breath, however, he quit smoking 12 months ago. (Tr. at 919.) He also complained of severe left shoulder pain with limited range of motion and that he could not lift more than five pounds. (Id.) He reported a pain level of 9 out of 10. (Tr. at 918.) Dr. Lieving injected Claimant's left shoulder with depomedrol and lidocaine, which he tolerated well; he discontinued the gabapentin and tramadol and prescribed hydrocodone 7.5 mg for pain. (Tr. at 922.)

In April 2015, Claimant had a three month follow up appointment with Dr. Lieving. (Tr. at 941-946.) He had moderate COPD with severe symptoms; he was not able to perform yard work due to shortness of breath and cough. (Tr. at 942.) Claimant had severe daily left shoulder pain due to osteoarthritis, but controlled with hydrocodone. (Id.) Claimant had normal respiratory effect, and an otherwise normal physical examination. (Tr. at 944-945.) It was noted that his

medical conditions were stable and controlled, but poor. (Tr. at 945.) His medications were not changed, and he was encouraged to engage in a graded walking program for lung function. (Id.)

Claimant returned to see Dr. Lieving almost two weeks later with complaints of pain at a level of 8 out of 10. (Tr. at 947.) He reported having pain since Saturday when his pain increased while changing blades on the lawn mower. (Tr. at 948.) He denied shortness of breath or cough and had no other complaints. (Tr. at 950.) He had normal respiratory effort and normal bilateral auscultation; he had a normal physical examination. (Id.) Dr. Lieving injected his left shoulder with depomedrol and lidocaine. (Tr. at 951.)

<u>Dr. Lieving Residual Functional Capacity Assessment:</u>

On December 15, 2014, Dr. Lieving completed a residual functional capacity assessment form on Claimant's behalf. (Tr. at 936-940.) Dr. Lieving opined that Claimant could lift and/or carry less than ten pounds, but could not lift more than five pounds with his left shoulder. (Tr. at 937.) He further opined that Claimant could stand and/or walk for two to four hours per regular[7] workday, could sit for six to eight hours per regular workday, and must alternate between standing and sitting every two hours. (Id.) Dr. Lieving asserted that Claimant could not push and/or pull to operate hand or foot controls due to his lung disease and shoulder. (Tr. at 938.) He could not return to his past work as a steelworker. (Id.) Dr. Lieving opined that Claimant was capable to sedentary work; Claimant was capable of frequent crawling, reaching (right arm), simple grasping, firm grasping, handling, fingering, feeling, seeing, hearing, speaking, and driving a car; was capable of occasional climbing, balancing, stooping, kneeling, and crouching; but never reaching with his left arm. (Tr. at 938-939.) Dr. Lieving further opined Claimant could not tolerate any temperature

---

[7] The form indicates a workday being "6 to 8" hours. (Tr. at 937.)

extremes or fumes, dust and humidity. (Tr. at 939.)

Dr. Lieving based his opinions on Claimant's diagnoses of COPD – stage 2, moderate; left shoulder osteoarthritis, severe; and bilateral knee osteoarthritis, moderate. (Id.)

**The Administrative Hearing**

Claimant Testimony:

Claimant testified that he had to quit working at the steel plant due to the physical demands of the job, which including standing the entire work shift, having to lift items that weighed more than fifty pounds and as much as one hundred pounds constantly, being exposed to great heat due to the molten metal and metal dust and fumes. (Tr. at 40-44.) His breathing, pain in his legs and shoulder reached a point where he could no longer work. (Tr. at 46.)

Claimant stated that his breathing got worse in 2003 and decided that he needed medical treatment for it. (Tr. at 47.) He testified that he must use a albuterol nebulizer machine every six hours that takes at least ten to fifteen minutes each time in order to treat his breathing problems. (Id.) He stated that his COPD causes him to be out of breath just to walk to the bathroom, which is only thirty feet away from his bedroom. (Tr. at 47-48.) Getting in our out of his car causes him to lose his breath and heat makes it worse, too. (Tr. at 48.) He tires easily and usually remains seated. (Id.) Just standing causes him to be fatigued. (Tr. at 49.)

Claimant explained that he hurt his left shoulder at work, and an MRI confirmed it to be a torn rotator cuff, which he had surgically repaired. (Id.) The repair lasted about a week or two, and it tore again, so he had another surgery, where four screws were put in to hold it in place. (Id.) He had a third surgery because he developed a cyst over the screws. (Id.) He continues to get cortisone injections in the shoulder about once a year or every six months and takes pain medication. (Tr. at

12

49-50.) Claimant also had physical therapy for his shoulder and a specialist at the Ohio State athletic hospital indicated there were problems with his shoulder, but did not want to get involved with it. (Tr. at 50.) Sometimes, Claimant will use ice packs if his shoulder is hurting; heat makes the pain worse. (Tr. at 50-51.) He testified that he can lift his left arm about waist high and that it hurts constantly. (Tr. at 51.) He cannot lift it straight out to the side of his body. (Id.) Claimant has to use his other arm for personal grooming and getting dressed. (Id.) He stated that he could not lift five pounds and that his doctor advised him to avoid reaching, lifting or using his left arm at all. (Tr. at 52.)

Claimant tore the meniscus in his right knee at work, and later did the same thing to his left knee. (Tr. at 53.) He has had surgery on both knees but had a second surgery on his left knee, and has not had to have any additional surgeries, but he had not been doing any heavy work. (Id.) He had physical therapy for his knees, and has had cortisone injections in both knees and has also had fluid drained from them. (Tr. at 53-54.) He testified that squatting hurts and his knees lock out of place; the pain in his knees did not get better. (Tr. at 54.) Despite the surgeries, Claimant stated that he feels constant pressure on his knees when he is standing. (Id.) Though his last injection in his knees was in 2005 or 2006, Claimant testified that having to stand on concrete all day at work finally made him quit, in addition to his breathing issues. (Tr. at 54, 55.)

The side effects from his pain medication makes him dizzy and sleepy, especially when he stands up very fast. (Tr. at 55-56.)

Claimant testified that he could probably stand or walk ten minutes out of an eight hour workday before having to sit down to take the weight off. (Tr. at 56.) He would then need to sit

for about five minutes before he could get back on his feet again. (Id.) He estimated that out of an eight hour workday, he could be on his feet for two hours total. (Id.)

Claimant used to be active in sports, hunting, fishing, and hiking before he started having problems with his shoulder and knees, and can no longer do those activities. (Tr. at 57-58.) Claimant sleeps sitting up; he cannot sleep on his left side due to his shoulder and usually sleeps about four hours. (Tr. at 58-59.) He is tired most days and often falls asleep. (Tr. at 59.)

### Dennis Duffin, Vocational Expert ("VE") Testimony:

The VE described Claimant's past work included light, medium and heavy, where most of his prior jobs were classified as heavy work. (Tr. at 61.) The VE testified that Claimant's limitations precluded him from performing his past work. (Tr. at 68.) When given the hypothetical individual with Claimant's age, education, work history and physical limitations, described in the ALJ's RFC, *supra*[8], the VE testified that the individual could work as a cashier, furniture rental clerk or toll collector, at the light exertional levels. (Tr. at 69.) The VE stated further that those jobs are primarily seated, with the clerk job more standing, but would not exceed four or two hours at a time. (Tr. at 70.)

In response to questioning by Claimant's attorney, the VE confirmed that the jobs he identified were light and the cashier job allows an individual to sit or stand as needed. (Tr. at 70-71.) The VE further explained that the Dictionary of Occupational Titles defines light work where an individual would be exerting a negligible amount of force about two thirds of the time, constantly, or exerting up to twenty pounds of force occasionally, and/or up to ten pounds of force frequently. (Tr. at 72.) The VE also stated that the jobs he listed have no production demands. (Tr.

---

[8] (Tr. at 17, Finding No. 5.)

at 73.) When asked if the individual was limited to lifting less than ten pounds and to standing or walking two to four hours out of the workday, the VE testified that no light work would exist, only sedentary work. (Id.) Postural limitations with climbing, balancing, stooping, kneeling, crouching or crawling would have no effect on the jobs the VE identified. (Tr. at 74.) If the individual could only be on his feet three hours out of the workday, the VE stated the cashier job would be fine, but was uncertain as to the furniture rental clerk, as two hours on his feet total would eliminate the job, but four hours would not eliminate this job. (Id.) The VE testified that given Claimant's testimony as to his limitations, such as being on his feet only two to three hours out of an eight hour workday and not being able to lift with his left hand, only five pounds occasionally, there would be no light level jobs. (Tr. at 75.)

## Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4ᵗʰ Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

As an initial matter, Claimant alleged that the ALJ's credibility assessment was made after to the RFC assessment, and also that the ALJ did not explain or evaluate Exhibit 5F. (Document No. 24 at 5-6.) The ALJ did not assess the RFC prior to his credibility determination; the ALJ properly applied the two-step process espoused by Craig v. Chater, 76 F.3d 585, 594 (4ᵗʰ Cir. 1996), and then proceeded to review Claimant's testimony and allegations contained in the Function Reports and reconciled them with the medical evidence of record. (Tr. at 17-21.) Afterwards, the ALJ determined that "based on the entire record, the undersigned finds that due to the claimant's physical impairments, the claimant is capable of performing work at the light exertional level[.]" (Tr. at 21.) Therefore, the undersigned **FINDS** this argument lacks merit.

With regard to the medical records concerning Claimant's colonoscopy and subsequent rectal bleeding, the ALJ did consider this evidence, and determined that those impairments were "not severe" because they had minimal limitation in Claimant's ability to perform basic work activities. (Tr. at 16.) Those records also did not contain "opinion evidence" that was to be "evaluated" or assigned a "weight" pursuant to 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). There were no medical opinions as to what Claimant could still do despite the impairment (colonoscopy/rectal bleeding), only that Claimant was discharged after both procedures in stable condition and that his physical examinations were normal. Moreover, the ALJ recognized that Claimant alleged that he is unable to work not because of the complications from the colonoscopy, but "due to shoulder and knee problems, pain, and breathing problems" (Tr. at 17.), which is

precisely what Claimant testified caused him to quit working in July 2013 at the administrative hearing. (Tr. at 55, 60.) Accordingly, the undersigned **FINDS** this argument also lacks merit.

Evaluation of Opinion Evidence/Credibility Assessment:

Claimant's next arguments are that the ALJ did not properly evaluate Dr. Lieving's opinion and/or that the ALJ failed to appreciate the fact that Claimant's unemployment reduced the number of visits to the emergency room impacted the ALJ's credibility analysis or indicated that his functional capacity improved. (Document No. 24 at 6-7.)

The Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the

factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

The ALJ discussed Dr. Lieving's December 2014 medical source statement at length, including all the limitations the treating physician noted, as well as his opinion that Claimant is limited to sedentary work. (Tr. at 20.) Further, the ALJ noted that in an April 2015 treatment note, Dr. Lieving opined that Claimant "continued to have permanent and total disability." (Tr. at 20, 945.) The ALJ gave Dr. Lieving's opinions little weight

> because this checklist form [December 2014 medical source statement] is not consistent with other medical evidence of record showing that the claimant has mostly normal physical examinations with only some minimally reduced left arm strength; he has some breathing problems, but records show that his symptoms are controlled with medication and he does not consistently complain[] of significant breathing problems. His more significant left arm pain was related to periods of strenuous activity.

(Tr. at 20.) The ALJ's explanation provides good reasons for discounting Dr. Lieving's opinions under Fourth Circuit jurisprudence. Cook v. Heckler, 783 F.2d 1168 (4th Cir. 1986); Hammond v. Heckler, 765 F.2d 424 (4th Cir. 1985). Further, the opinions relegating Claimant to sedentary work and that he continued to have permanent and total disability are determinations exclusive to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Moreover, pursuant to Sections 404.1527(d)(3) and 416.1527(d)(3), the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."

In short, the under signed **FINDS** the ALJ's evaluation of Dr. Lieving's opinion evidence is supported by substantial evidence.

With respect to Claimant's credibility analysis, the ALJ is bound by Social Security Ruling 96-7p[9], which clarifies the evaluation of symptoms, including pain: 20 C.F.R. §§ 404.1529, 416.929 require a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. See also, Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to: (1) the medical signs and laboratory findings; (2) diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and (3) statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

---

[9] The undersigned is aware that this Ruling has been superseded by SSR 16-3p, effective March 28, 2016, however, the former Ruling applies to the ALJ's decision herein, having been issued on May 29, 2015. See, SSR 16-3p, 2016 WL 1131509.

Moreover, it is well known that credibility determinations are properly within the province of the adjudicator and beyond the scope of judicial review. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990); <u>Davis v. Colvin</u>, 3:13-CV-23399, 2015 WL 5686896, at *7 (S.D.W. Va. Sept. 8, 2015) ("The credibility determinations of an administrative judge are virtually unreviewable on appeal.")

As mentioned *supra*, the ALJ's credibility analysis did not offend Fourth Circuit jurisprudence, and the ALJ discussed at length Claimant's statements concerning his pain and other symptoms and compared them with the objective medical records. Importantly, the ALJ took note of numerous normal physical examinations having taken place after the alleged onset date, from October 2013 through April 2015; despite Claimant's complaints of pain, he was treated with prescription medications or cortisone injections, and his COPD was regularly found to be stable. (Tr. at 19-20.) Although Claimant is correct in his assertion that when he quit working at the steel plant that his exposure to that work environment reduced the number of emergency room visits, indeed, the ALJ determined that he was incapable of performing his past relevant work as a result of his impairments. (Tr. at 21.) However, the ALJ did not find that Claimant's functional capacity improved, only that Claimant was not as limited by his impairments as alleged. Accordingly, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence and the credibility assessment were supported by substantial evidence.

<u>The RFC Assessment/Hypothetical Question to VE:</u>

Claimant takes issue with the hypothetical questions the ALJ posed to the VE and the resultant RFC assessment with respect to certain limitations: the ALJ's treatment of Claimant's hearing loss; the ALJ's restriction from toxic fumes, gases, and odors; the ALJ's specific

limitations with respect to Claimant's left upper extremity; and Claimant's use of a nebulizer every six hours. (Document No. 24 at 8-9.)

Residual functional capacity represents the *most* that an individual can do despite his limitations or restrictions. See Social Security Ruling 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

Starting with Claimant's hearing loss, there is no dispute that Claimant showed more hearing impairment in his right ear than left, however, there is no opinion evidence in the record that suggested Claimant's functional capacity was reduced due to his hearing problems. Only Dr. Nutter noted that Claimant had "mild difficulty understanding conversational level voice." (Tr. at 20, 844.) Though the ALJ accommodated this "severe impairment" by restricting Claimant from "excessive noise from industry", there is no evidence in the record that Claimant was incapable of the jobs identified by the VE due to his right side hearing loss. (Tr. at 17.)

The ALJ also restricted Claimant from being around "toxic levels of fumes, gasses, or odors" for which Claimant complains the ALJ provided no explanation. (Document No. 24 at 8.)

As noted *supra*, the ALJ found Claimant's COPD was a severe impairment and the evidence of record clearly showed that Claimant's exposure to the fumes, heat, metal and coal dusts from his prior work caused him to seek medical attention due to his breathing issues. Again, as noted above, the ALJ determined Claimant was unable to return to his past work as a result of his physical impairments, therefore, the restriction from the "toxic" fumes, gasses and odors in the hypothetical and RFC was appropriate. Indeed, this restriction was corroborated by the opinion evidence, including that provided by Dr. Lieving. (Tr. at 939.) Claimant's use of a nebulizer every six hours for his breathing issues is related to the ALJ's RFC environmental limitations from fumes, gasses, odors, however, there is no evidence in the record that indicated Claimant's use of a nebulizer had any significant impact on his ability to perform basic work activities.

> With respect to Claimant's upper left extremity, the RFC stated the following:
>
> the claimant can occasionally use the left non-dominant upper extremity for overhead reaching or reaching with the arm fully-extended away from the body, but can frequently use the left arm within about 16 inches of the body and not overhead; is limited to lifting 10 pounds maximum with the left arm alone[.]

Dr. Nutter examined Claimant and noted his upper left extremity limited range of motion, but also found that Claimant's arm strength overall was 5/5, although his left arm was 4/5 due to pain. (Tr. at 846.) State agency medical consultants acknowledged Claimant's upper left extremity limitations, which included his "significantly limited ROM" that limited Claimant's ability to reach in front and/or laterally as well as overhead. (Tr. at 90, 91, 101, 102, 115, 116, 117.) Dr. Lieving opined Claimant could lift or carry no more than five pounds or perform push/pull controls because of his left shoulder limitations. (Tr. at 937, 938.) Dr. Lieving also found Claimant capable of frequent crawling, simple grasping, firm grasping, handling, fingering, feeling, seeing, hearing, speaking, and driving a car, and occasional climbing without specific notation regarding

Claimant's left arm. (Tr. at 938-939.) Claimant testified that he could lift his left arm waist high, but could not lift it straight out to his side or lift more than five pounds with it. (Tr. at 51, 52.)

The ALJ specifically addressed Claimant's left arm restrictions when he asked the VE to consider other work for a hypothetical individual:

> With the non-dominant upper extremity, the left, with use of that limb alone, he would have capacity for overhead reaching or reaching with full extension away from the body on the left alone, and that's going to be ten pounds - - will carry ten pounds occasionally on that limb, if it's under those conditions, overhead, or a full extension. Now, he could - - with lifting or use of the left upper extremity close in to the body from a distance of 12 to [16] inches from - - again, he should be limited to 10 pounds only with the left only, but it's got to close in to the body, his capacity to use that limb on a frequent basis, 12 to [16] inches away from the body and not overhead. Assume he can bend the elbow in order to make that happen . . . the dominant upper extremity is not impaired with regard to use, station, et cetera, and with both extremities, there is no difficulty with fingering or handling . . . by using the right arm alone, or with some combination of the right being assisted by the left, under either capacity, he could occasionally lift and carry 20 pounds, frequently lift or carry up to 10 pounds.

(Tr. at 64-65.) The VE's response, as noted above, was that the hypothetical individual with Claimant's limitations could perform light work, and that the jobs he identified could entail pushing and/or pulling of arm or leg controls while sitting most of the time, and that the amount of force exerted would be negligible pursuant to the Dictionary of Occupational Titles (DOT). (Tr. at 71-72.) The VE testified that the jobs he identified did not conflict with the DOT (Tr. at 70.), and the ALJ subsequently found that the VE's testimony was consistent with same. (Tr. at 22.) Hypothetical questions need only incorporate those limitations that an ALJ accepts as credible and that are supported by the record. See Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989). As stated above, the reconciliation of conflicting evidence was for the ALJ to resolve, not this Court. See SSR 96-8p, 1996 WL 3741784, at *7. Therefore, Claimant's disagreement that the VE impermissibly identified jobs that complied with the DOT and that were responsive to the ALJ's

hypothetical questions is without merit.

In sum, the undersigned **FINDS** that the ALJ's RFC assessment and hypothetical questions posed to the VE are supported by substantial evidence, and further **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for Judgment on the Pleadings (Document No. 24.), **GRANT** the Defendant's request to affirm the decision (Document No. 27.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106

S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: July 20, 2017.

Omar J. Aboulhosn
United States Magistrate Judge